[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These three consolidated cases were tried to the court on June 13 and 14, after which briefs were filed by the parties. Marilyn Miller's claims are set forth in a Third Amended Revised Complaint dated January 19, 1999, Arnold Miller and Stephen Miller's claims are enumerated in their Third Amended Revised Complaints, both dated January 25, 1999. By pleading dated September 11, 2000, Stephen Miller has requested leave to amend his complaint to correct the inadvertent omission of a fifth count claiming a violation of the Connecticut Uniform Securities Act (CUSA). This claim had been part of an earlier complaint filed on behalf of Stephen Miller, and relief based on CUSA was included in his Third Amended Revised Complaint. Nevertheless, the defendants have objected to this request, based, in part, on their assertion that the CUSA claim is now barred by the applicable statute of limitations. The plaintiff's failure to restate his CUSA claim in the most recent iteration of his complaint was discovered after the conclusion of the evidence and is an inadvertence which caused no prejudice to the defendants. The CT Page 12821 presentation of evidence relating to Stephen Miller's claim was not materially different from the presentations regarding each of the other plaintiffs, and the defendants can not reasonably claim any surprise in regard to this request. The plaintiff's post-trial motion to amend is granted.
The plaintiffs' actions arise from loans they made to Inverness Corporation between March, 1995 and July, 1996. On March 29, 2000, judgments entered for the plaintiffs on the counts of their complaints relating directly to the promissory notes. The remaining counts by the plaintiffs variously allege breach of fiduciary duty, negligence, violation of the Connecticut Unfair Trade Practices Act, (CUTPA), and violation of the Connecticut Uniform Securities Act (CUSA). Based on the trial evidence, the court makes the following findings and orders.
Arnold Miller is the president of Irving Simon Photographers, a New York S Corporation and family business. He, and his wife, Marilyn, are co-trustees of the company's federally-qualified defined benefit pension plan. Arnold Miller is a college graduate with business experience in marketing and annual personal earnings in 1995 in excess of two hundred thousand ($200,000) dollars. In March of 1995, Arnold Miller's personal net worth was in excess of one million ($1,000,000) dollars and his total family income for the year was approximately three hundred thousand ($300,000) dollars. Mr. Miller has had significant investment experience, having borne the responsibility for managing his family's financial assets and the pension fund entrusted to him. At the time of the transactions which are the subject of these actions, Mr. Miller had responsibility for approximately three million ($3,000,000) dollars invested on his behalf, on behalf of family members, and on behalf of the pension fund. The investments consisted of mutual funds, bonds, and real estate. Though Mrs. Miller possesses significant assets, she has historically yielded investment decisions concerning her assets and the pension fund to her husband.
Stephen Miller is the adult son of Arnold and Marilyn Miller. A graduate of Brown University, Stephen Miller is currently the manager of Irvin Simon Photographers. At times material to this litigation, he had no investment experience.
At the time of the transactions involved in this litigation, Inverness Corporation (Inverness) and Venture Partners Ltd. (Venture) were Connecticut corporations with a principal place of business in Kensington, Connecticut. The defendants Gary Laskowski and Jonathan Betts were principals and directors of both entities.
Toward the end of 1994 or early in 1995, Paul McCullough, an investment CT Page 12822 advisor who had assisted Arnold Miller in investment decisions in the past, brought Venture and Inverness to Miller's attention. McCullough spoke highly of Laskowski, and told Miller that these companies were seeking funds for with which to make loans. Subsequently, Betts gave Miller an information booklet entitled "Inverness Corporation" dated February 16, 1995. Miller read this booklet and spoke with Betts on more than one occasion before investing any funds with Inverness.[1] In the Overview portion of the Booklet it is stated: "Inverness Corporation, (Inverness) was founded to provide qualified pension plans and individuals a secured investment vehicle with predicable, high fixed current return without an excessive degree of risk." Plaintiff's Exhibit1, p. 1. On the same page is the following paragraph: "Inverness' primary lending instruments are trade receivables purchases, traditional promissory notes, and equipment lease/rentals. These are all characterized by strong collateral backing which significantly enhances the security of the principal investment." Id.
In the page captioned, "Lending Criteria" the following is stated:
 "Lending Criteria" Inverness uses four criteria in determining whether a particular loan will be made and the structure of that loan.
 CHARACTER
 The first criteria is the nature of the people involved in the business. While people are not the single most important aspect of a particular loan, they are of critical importance. We have learned over the years that if things do not go as planned, the character of the borrower, rather than the character of the collateral, is the most important issue in ensuring that the obligation is satisfactorily repaid.
 COLLATERAL
 Secondly, we look at the strength of the collateral. While other lenders look more to cash flow for repayment, we strive to insure that if the cash flow diminishes there are more than sufficient saleable assets to recover the principal investment in a reasonable time. Collateral may consist of any hard asset such as receivables, inventory, cash, letters of CT Page 12823 credit, or real estate. We don not consider proprietary information, patents and other intangible assets as hard collateral, although the Company might use these as additional collateral in the course of consummating a loan with us. In fact, most times we require a blanket lien on all assets. Additionally, we often require personal guarantees of the principals of the borrower, thereby tying each in more fully to satisfy repayment of the obligation.
 BUSINESS VIABILITY
 Thirdly, we look at the nature of the business. Is it viable over the course of the loan? Who are the customers? Are these customers credit worthy? Is the generated inventory saleable quickly and at what discount from cost? Generally, this part of the equation closely resembles traditional credit analysis.
 EXIT STRATEGY
 Fourthly (sic), we look at the method by which the loan is liquidated on an ongoing basis. We prefer to structure arrangements such that our investment is liquidated in the normal course of business, for instance when a receivable is collected. By using this approach, we are more specifically able to track the progress of the business as well as the movement of collateral. We do, however, often provide credit in which the collateral is fixed. In these cases, our exit might be through a refinance, normal cash flow, or a sale of assets." Id. p. 2.
Also, in this booklet, Inverness represented: "There are three primary vehicles the Company uses to finance its clients." Id. p. 3. Those were described as "receivables financing", "equipment lease", and "term/bridge loans." Id. With respect to these forms of investment, and on the same page, the booklet reads:
 "In all of these transaction Inverness goal is to maintain as large a collateral cushion as possible between the loan amount and the tangible value of the collateral. So, for instance, in purchasing receivables, it is infrequent that Inverness will advance more than 75% of the face value of the asset. CT Page 12824 On leases/rentals, the asset value in relation to the financing is often less than 70% of the liquidation value of the owned assets."
On the page captioned, "General Information" the booklet states the following in regard to its clients:
"CLIENT FOCUS
 From an industry perspective, Inverness focuses on business that are growing and have tangible assets to secure. The typical client's sales are between $1.0 million and $5.0 million, although we have clients whose sales are less than $500,000 and mor than $25 million. The Company prefers manufacturing clients rather than service clients, primarily because of the asset base. However, in the receivables financing area, the quality of the client's customer credit along with the degree to which there might be a dispute on the quality of the service, and therefore, the quality of the receivable, is also considered.
 Inverness does not specialize in particular industries or segments and currently provides financing in the electronics, chemical, and machining industries." Id. p. 4.
Finally, with respect to the Inverness Information Booklet, it includes biographies of the principals, Laskowski and Betts. A fair reading of their biographies could reasonably lead one to believe them to be well-educated businessmen with experience in the industries noted as clients. Both gentlemen are also portrayed as individuals with financial acumen.
Before placing any money with Venture for investment in Inverness, Arnold Miller read and relied upon this booklet. Additionally, he met with Betts to further discuss the potential investment and the representations made in the booklet. In one such conversation dealing with the safety of loans by Inverness, Betts represented that such loans would be particularly safe because the money received by Venture and Inverness was going to be loaned to several different clients, thus spreading the risks. Miller testified credibly that these representations were consistent with the impression he received from reading the booklet. While the defendants correctly point out that the booklet contains disclaimers and a statement that no potential investor may rely on any representations made outside of the booklet, it was not CT Page 12825 unreasonable for Miller to place reliance on a principal of the enterprise, particularly since the statements made by Betts could reasonably be seen as amplifications of the general principles set forth in the booklet.
Following his receipt of the Information Booklet dated February 16, 1995 and his meeting with Betts, Miller, on behalf of his wife, made an initial investment on March 22, 1995. In return for the loan of fifty thousand ($50,000) dollars to Inverness, Mrs. Miller received a promissory note payable in full in two years with monthly interest payments at the annual rate of fourteen (14%) percent. While monthly interest payments were made for a time, Inverness failed to pay the principal amount of the debt at maturity and is in default on this loan.
Later, Arnold Miller received another Information Booklet from Inverness, this one dated June 1995. Miller testified credibly that he read this booklet and discussed further transactions with Betts before making any additional loans through Venture to Inverness. Miller testified, and the court finds, that the general descriptions of the manner of operations of Venture in Inverness in this latter booklet are substantially similar to the earlier version.
On November 13, 1995 Stephen Miller loaned the sum often thousand ($10,000) dollars to Inverness. In exchange, he received a two year promissory note requiring monthly interest at the annual rate of 14%. Prior to making this investment, Arnold Miller had told his son about Venture and Inverness and he had suggested that Stephen Miller consider them as a possible investment vehicle. Prior to making an investment, Stephen Miller received an Information Booklet on Inverness from Venture and had discussed the investment with Betts who had characterized the potential investment as an asset-backed loan. In his conversation with Betts, Stephen Miller stated that he was inexperienced in financial matters. Miller testified credibly that he relied on the contents of the Information Booklet and his discussion with Betts before deciding that the placement of funds with Venture and Inverness as a secured loan to Inverness would be a relatively safe and secure investment. While some interest payments were made by Inverness pursuant to the loan agreement, the principal was not paid at maturity and Inverness is in default.
Based on the information contained in the Information Booklet he had received several months earlier, the contents of conversations with Betts in which Betts stressed the secure quality of the loan transactions, and mindful of the performance of the earlier notes, on February 2, 1996, Arnold Miller advanced one hundred thousand ($100,000) belonging to his wife, Marilyn Miller, to Venture to be loaned to Inverness in exchange for a promissory note requiring monthly interest payments at the annual CT Page 12826 rate of 14% and due in twenty-four months. This note is in default.
Also in 1996, Arnold Miller had a conversation with Betts in which they discussed the investment of pension funds in loans to Inverness. In this conversation both gentlemen discussed the relative safety of such a transaction for pension funds. Following this conversation, and, mindful of past conversations, the contents of the Information Booklet, and the prompt periodic interest payments made on the previous loans, on July 2, 1996, Miller made a loan of fifty thousand ($50,000) dollars from the pension plan to Inverness in exchange for a promissory note requiring monthly interest payments of 14% with the principal due in twenty-four months. This note is in default.
The documentary evidence submitted at trial amply demonstrates that the funds advanced by the plaintiffs to Venture and Inverness were not prudently invested by the defendants. Contrary to the claims set forth in the Information Booklet and the representations made by Betts, Inverness invested the proceeds received from the plaintiffs in dubious, or failing, enterprises, and, in some instances, into entities in which either Laskowski or Betts, or both, had a financial interest. From 1994 to 1997 Inverness borrowed between $10.1 million and $11 million and had concentrated a substantial portion of that amount in two companies, EAC Acquisition 1 Corporation (EAC) and Power Designs, Inc. (PDI). As of December 31, 1998 Inverness had an outstanding credit balance with PDI in excess of $7.2 million, and as of February 1, 1999 it had a credit balance of $1.6 million with EAC.
In addition to the questionable investment strategy of concentrating a substantial amount of its loan portfolio on two debtors, documentary evidence indicates that these were self-dealing loans made to entities in poor financial condition. In its Amended Disclosure Statement for its Amended Plan of Reorganization in conjunction with its bankruptcy filing reflects that PDI was not a profitable business when Inverness loaned funds to it. Plaintiffs' Exhibit 34, Amended Disclosure Statement for theAmended Plan of Reorganization for Power Designs, Inc and PDIXFAcquisition Corporation. Financial statements filed by PDI for the relevant time period demonstrate that it contained insufficient assets to secure Inverness' loans to it.
Both Laskowski and Betts were directors of PDI. They had been engaged to assist PDI in 1991 in regard to an issue with the Internal Revenue Service and they were aware that PDI had filed for bankruptcy protection in 1992. Documents filed in conjunction with the bankruptcy reorganization show that in 1994, Venture owned approximately 60% of the common stock of PDI. Subsequently, in 1995, Venture transferred approximately one million shares of its common stock in PDI to Millenia CT Page 12827 Capital Holdings LLC (Millenia), an LLC owned by the spouses of Laskowski and Betts and operated by Laskowski.[2] This transfer was made without consideration. Subsequently, on September 15, 1997, Venture transferred approximately one hundred and fifty thousand (150, 000) shares of PDI common stock to Bril Corporaton, a Connecticut corporation in which both Laskowski and Betts had an ownership interest. At no time in his dealings with members of the Miller family did Betts disclose his interest in PDI, the precarious financial condition of PDI, or the decision by Inverness to loan funds to PDI while it was mired in failure. Finally, with respect to PDI, in 1996 and 1997, Venture had a consulting agreement with PDI through which Venture received approximately one hundred thirty eight thousand ($138,000) dollars in fees and expenses from PDI. Betts made no disclosure to the Millers of this aspect of Venture's relationship to PDI. While the defendants assert that their acquisition of an equity interest in PDI was intended to provide security for funds loaned to PDI, and this may, in part, be true, the inter-connected relationship between the defendants and PDI were not disclosed to the plaintiffs when they were induced to invest funds with Inverness on the basis of representations made by Inverness in its Information Booklet and on its behalf by Betts. The March 9, 1998 communication from Betts to Arnold Miller makes it plain that a substantial reason for the failure of Inverness to repay the loans involved in this litigation was the lack of success of PDI.
The relationship between the defendants and EAC is even murkier than their relationship with PDI. Inverness financial statements show that between December 31, 1995 and December 31, 1996, notes receivable from EAC increased from approximately two hundred nineteen thousand ($219,000) dollars to two million, eight hundred thousand ($2,800,000) dollars. The February 1, 1999 balance of promissory note debt from EAC to Inverness was reported by Inverness to be approximately one million, six hundred thousand ($1,600,000) dollars based on an original principal balance of approximately twenty thousand ($20,000) less than the amount due as of February 1999. At trial, the parties agreed that the Inverness loan to EAC was made in connection with a secured party sale of a Company called 1 Technologies, Inc (Tech), and that Laskowski and Betts were directors of Tech at the time of the Inverness loans to it. Subsequently, Inverness filed a lawsuit against EAC in connection with this loan transaction. In that litigation, an entity known as Menotomy Funding, LLC (Menotomy) is also a plaintiff. Laskowski is a manager of Menotomy. In that action, the plaintiffs have alleged that on December 20, 1997, Inverness made a revolving line of credit available to EAC in the amount of one million, seven hundred and eighty thousand ($1,780,000) dollars and gave a term loan in the amount of one million six hundred and forty thousand ($1,640,000) dollars to EAC and that EAC defaulted on the loans on January 29, 1997.[3] The court agrees with the plaintiffs' contention CT Page 12828 that the facts of this transaction demonstrate not only that the individual defendants were insiders with respect to the Tech transaction, but that the contours of the transaction, as indicated by the documentary evidence, demonstrate that at the time it was a high risk loan with inadequate security and not an asset-based loan as touted in the Inverness Booklet and the promises of Betts. In its March 9, 1998 letter to Arnold Milller, Inverness posited its unsuccessful dealings with EAC as a significant reason, along with the PDI transaction, for its inability to repay the plaintiffs' loans in accordance with the terms of the notes.
While there is documentary evidence that at material times Inverness made loans to two other entities, Compliance Coatings and Maple Street, LLC, in which one or more of the individual defendants had management authority, the evidence is insufficient to draw a nexus between the failure of these entities and the non payment of the subject loans by Inverness.
Thus, with respect to the three plaintiffs, they loaned Inverness the combined sum of two hundred and ten thousand ($210,000) dollars in four promissory notes, all of which are in default. On behalf of each plaintiff, judgment has been entered against Inverness for the amounts due under the notes, plus interest. The plaintiffs' quest for further relief against Inverness, Venture, Laskowski and Betts is premised on the legal theories of breach of fiduciary duty, negligence, and violations of CUTPA and/or CUSA. Each is separately analyzed.
 BREACH OF FIDUCIARY DUTY
The plaintiffs assert that Venture acted as the agent of Inverness in soliciting funds to be invested, and that Betts and Laskowski were principals of each entity and, as such, managed and controlled their affairs. Therefore, the plaintiffs argue, Betts and Laskowski bear the responsibility not only for representations made by Venture and Inverness to induce investments but for the investment decisions made by each entity. The plaintiffs further claim that they invested an aggregate sum of two hundred and ten thousand ($210,000) dollars based on the representations that the funds would be safely invested. The plaintiffs assert that they each had a fiduciary relationship with all the defendants and that the defendants breached their fiduciary duties.
The Appellate Court has recently observed that, "Connecticut courts have `specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations. . . ."(Internal quotation marks omitted) (internal citations omitted) Instead, a fiduciary relationship exists where there is a justifiable trust confided CT Page 12829 on one side and a resulting superiority and influence on the other."Southbridge Assoc. v. Garofalo, 53 Conn. App. 11, 18 (1999). The court continued, "A fiduciary relationship is characterized "by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other'." Id. citing Dunham v. Dunham, 204 Conn. 303, 322
(1987).
In this action, while the court believes the defendants Betts, Inverness and Venture made negligent misrepresentations to the plaintiffs, and all defendants were negligent in their handling of the plaintiffs' investments, the evidence falls short of establishing a fiduciary relationship between the plaintiffs and the defendants. The plaintiff Arnold Miller is an intelligent, experienced investor. The fact that he previously confined his investments to mutual funds, bonds, and real estate is not evidence of inexperience or lack of expertise, but rather it demonstrates a history of careful and conservative stewardship of funds under his control. The fact that he did not previously place his funds with entities that invest in accounts receivables belies the assertion that he is a naive investor. And while Mrs. Miller cannot reasonably be portrayed as an experienced investor, it is evident that she yielded this role to her husband. Thus, when he invested her funds, Miller operated as his wife's agent. Similarly, while Stephen Miller was an inexperienced investor at the time, since his first knowledge of this potential investment came from his father and he contacted Betts at the suggestion of his father, his initial decision to invest with Inverness was influenced, in good measure, by his father.
Also, the defendants were not in an advisory relationship to the plaintiffs. Unlike the mortgage broker who acts as an investment counselor or the broker who manages a discretionary account, the defendants in this case sold the plaintiffs the opportunity to invest in specific vehicles-short term, high interest promissory notes. Thus, the plaintiffs didn't simply place their funds with the defendants with the anticipation that the defendants, because of their superior knowledge and control of the funds, would place them in investment vehicles best suited for the plaintiffs' strategic needs. Finally, the plaintiffs bore some responsibility for due diligence. While the court finds credible Arnold Miller's testimony that the prompt monthly interest payments on the earlier loans encouraged him to increase his investment with the defendants, that sign of success did not relieve him, as an investor, of the responsibility to seek sufficient financial data so as to inform himself concerning the extent and quality of the security collateralized in each of the loans. To the extent that such information could have been requested by Miller of the defendants before any investments were made, the defendants' superior knowledge arose through the plaintiffs' CT Page 12830 default.
Having failed to prove the existence of a fiduciary relationship between the parties, the plaintiffs' claims fail in that regard.
 THE ALLEGATIONS OF NEGLIGENCE
The plaintiffs' negligence counts are set forth in the Third Count of the Arnold and Stephen Miller complaints and in the Fourth Count of the Marilyn Miller complaint. The plaintiffs allege that the defendants were negligent and careless in failing to exercise due care in investing said sums and in safeguarding the same for ultimate repayment to the plaintiff herein in accordance with the representations made to the plaintiff relating to the investment vehicles where said funds would be placed. The court agrees.
At the outset, the court notes that the plaintiffs' need not prove the existence of a fiduciary relationship between themselves and the defendants in order to prevail in their negligence claims. As noted by the plaintiffs in brief, "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." Coburn v. Lenox Homes, 186 Conn. 370, 375 (1982). The Inverness and Venture Information Booklet was a marketing vehicle utilized to solicit and promote business for the defendants. Its implied promises of carefulness and diligence were repeated and amplified by Betts in his conversations with both Millers, father and son. At the same time, the defendants were aware of the actual investment history of Inverness, and with the plaintiffs' funds in hand the defendants made reckless and imprudent investments putting at significant risk the probability of the plaintiffs' receiving the benefit of the bargain. By their unwise investment decisions and failure to inform the plaintiffs of the actual risks of the venture the defendants acted unreasonably with significant negative consequences to the plaintiffs. The court agrees with the plaintiffs' assertion that "When the defendants undertook to invest the plaintiffs' money, according to the Information Booklets, in `secured investment vehicles with predictable high fixed current return without an excessive degree of risk,' the defendants were under a duty to exercise ordinary care to meet that standard." Post Trial Brief of thePlaintiffs. p. 35. dated July 28. 2000. By lending money to entities about which they had inside information, and in circumstances in which they knew, or should have known, that there was little likelihood of repayment and for which there was patently inadequate security, the defendants breached their duty of care to the plaintiffs, and this want of care proximately resulted in the plaintiffs' losses.[4] Judgment may CT Page 12831 enter for the plaintiffs as to their negligence counts.
 THE CUSA CLAIM
The Connecticut Uniform Securities Act (CUSA) governs the purchase and sale of securities. Connecticut General Statutes § 36b-4 provides, in part: "(a) No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. (B) No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly engage in any dishonest or unethical practice." While the statutory definition of a security is lengthy, it includes the following: "any . . . . evidence of indebtedness . . . investment contract." C.G.S. § 36b-3(17). The court finds that the activities of the defendants in this instance fall within the parameters of CUSA.[5]
The defendants solicited the plaintiffs' investment in promissory notes which, by definition, are evidences of indebtedness. And the defendants' activities in soliciting the plaintiffs' funds were activities in connection with the offer, sale or purchase of a security. Moreover, the defendants' behaviors violated the proscriptions of CUSA. While the court has found that the defendants acted carelessly in their solicitation of investment funds from the plaintiffs and in the investment decisions of Inverness, their failure to inform the plaintiffs of the particular relationships enjoyed by Betts and Laskowski in the entities in which Inverness invested was deceitful, dishonest and unethical. And while the court has found that the relationship between the plaintiffs and the defendants did not rise to one of fiduciary trust, the misrepresentations concerning investment policy made in the Inverness Booklet promoted by all defendants was reckless and unethical. The record of investments made by Inverness during the material time period demonstrates conduct of self dealing motivated by the defendants' self interests. By soliciting funds from the plaintiffs for investment in securities and by misrepresenting the nature of the investments to be made by Inverness and by failing to disclose the conflicting interests of Betts and Laskowski, by investing in failing entities without reasonable provisions for security, the defendants behaved worse than carelessly. They acted in reckless disregard for the safety of the plaintiff's funds. The court finds that the defendants conduct in this regard was violative of the provisions of CUSA. Judgment may enter for the plaintiffs on their CUSA claims.
CT Page 12832 THE CUTPA CLAIM
Connecticut General Statutes § 42-110(b)(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The provisions of CUTPA do not apply, however, to transactions which are subject to another regulatory scheme. Since the court has determined that the defendants activities implicate provisions of CUSA and afford the plaintiffs its remedial protections, the protections and remedies of CUTPA are not available to the plaintiffs. Russel v. Dean Witter Reynolds,Inc., 200 Conn. 172 (1986).
 REMEDIES
On the negligence counts, judgment may enter for the plaintiffs in the amount of the principal invested plus interest at the rate of 14% to the date of maturity. From the date of maturity until the date of this Memorandum, interest shall be added to this liquidated sum at the statutory rate of interest. From this sum shall be subtracted the amounts already paid to the plaintiffs from third party sources as reported in the plaintiffs' written advice to the court dated September 5, 2000.
On the basis of the court's determination of the CUSA counts, reasonable attorneys' fees and costs are awarded to the plaintiffs. To effectuate this provision, counsel for the plaintiffs shall submit, in affidavit form, an itemization of counsel fees for prosecuting this matter, together with other appropriate indicia of the reasonableness of the fees requested. The claimed amount shall be net of any funds received from third parties on account of attorneys' fees and/or costs. Such submission shall be made within ten days of this date. The defendants shall have a further period often days in which they may submit counter affidavits should they choose.
Once the court has issued its supplemental decision regarding attorneys' fees and costs, counsel for the plaintiffs shall prepare the judgment files.
Judgment may enter accordingly.
Bishop, J.